STATE OF NORTH CAROLINA v. WILLIAM E. SANDERS

No. 16

(Filed 14 July 1978)

1. **Homicide § 17.2— first degree murder—threat to kill deceased—evidence admissible**

In a prosecution for first degree murder of a military policeman, the trial court did not err in admitting testimony that defendant had been taken into custody approximately two weeks before the killing and had threatened to kill the policeman after being slapped by him at the Law Enforcement Center following that arrest, since evidence of threats by defendant was freely admissible to show premeditation and deliberation; the lapse in time between utterance of the threat and commission of the crime went only to the weight to be given the evidence and not its admissibility; and the evidence of defendant's prior arrest was inextricably connected to the circumstances which led to the making of the threat and was competent to show the relations between the parties.

2. **Arrest and Bail § 6; Homicide § 21.5— unlawful arrest—defendant's attempt to escape—use of force—first degree murder—sufficiency of evidence**

In a prosecution for the first degree murder of a military policeman while defendant was in a holding cell of the Law Enforcement Center, defendant's contention that his motion for nonsuit should have been granted because the evidence conclusively demonstrated that his actions were fully justified as a valid attempt to escape from an unlawful arrest and that he was privileged to use deadly force because he was confronted by attackers of greatly superior size and number and thus had a reasonable fear of death or serious bodily harm is without merit since defendant's prior threats against the deceased's

life and his statements to the military policemen to come on into the cell where he was, that he had something for them, together with his actions in deliberately backing into the toilet area of the cell and waving the victims toward him before drawing a knife, were sufficient to allow the jury reasonably to infer that defendant, after seeing the deceased at the Law Enforcement Center following his unlawful apprehension, decided to make good his earlier threat and, further, that defendant, by coincidence already having a knife in his possession, designedly and maliciously goaded the deceased into entering the cell and following him into the confined area of the toilet where defendant stabbed deceased and another policeman.

### 3. Homicide § 15.4 — intent of officers — opinion testimony inadmissible

In a prosecution for first degree murder of a military policeman while defendant was in a holding cell of the Law Enforcement Center, the trial court did not err in refusing to permit three defense witnesses to testify that they thought military policemen and deputies entered the holding cell prior to the stabbing for the purpose of beating up defendant, since it was possible for the witnesses to inform the jury of the words, acts and demeanor of the officers as they entered the cell, and the witnesses were in no way more qualified than the jury to conclude what the officers intended to do at that time.

### 4. Criminal Law § 75.1 — unlawful arrest — subsequent inculpatory statement — admissibility

Defendant's contention that his inculpatory statement was the fruit of his original unlawful arrest on a city street and therefore should have been suppressed is without merit since there was no conflict in the evidence on voir dire to determine voluntariness of the confession; the purpose of defendant's unlawful arrest was not intentionally investigatory in nature but was to take him off the city street and transport him back to Fort Bragg in order to prevent him from causing trouble; and a lawful arrest for homicide was interposed between the unlawful earlier arrest and defendant's subsequent inculpatory statement.

### 5. Homicide § 15 — place for carrying knife — admissibility of evidence

In a first degree murder prosecution where defendant stabbed his victim to death, the trial court did not err in allowing into evidence that part of defendant's statement in which he explained that when he carried a knife he placed it in front of his stomach or in back because an officer patting him down would be more likely to find it if it was carried to the side, since this admission was primarily one of fact, but even if it were an opinion, the prevailing rule now is that admissions in the form of opinions are competent.

### 6. Criminal Law § 85.2 — character evidence relating to defendant — character not in issue — evidence inadmissible

In a first degree murder prosecution where defendant stabbed his victim to death, the trial court erred in allowing the State, during presentation of its case in chief, to offer evidence of defendant's gang membership in another city, his stabbing of another gang member, and his expression of his hopes that the gang member would die, since defendant did not place his character in issue at trial and, at the time the State's evidence of defendant's earlier gang member-

State v. Sanders

ship was offered, he had not testified; and evidence of the prior stabbing showed a single, isolated event with insufficient elaboration of the surrounding circumstances to afford it any probative value on the question of defendant's intent during the incident which gave rise to the current charges against defendant.

**7. Arrest and Bail § 3.1— no probable cause for arrest—arrest unlawful**

The trial court properly determined that, notwithstanding the officer's declaration to the contrary, defendant's initial detention was in fact an arrest and that it was unlawful, since officers had no probable cause to arrest defendant who was apprehended while on a city street; he was asked to show his military identification card but refused; he was searched and his card was taken from him; and defendant was handcuffed and subsequently taken to the Law Enforcement Center.

**8. Arrest and Bail § 6; Homicide § 23— defendant's unlawful arrest—subsequent homicide—jury instructions improper**

In a prosecution for first degree murder of a military policeman while defendant was in a holding cell in the Law Enforcement Center, the trial court erred in reading to the jury during its charge certain provisions of the U. S. Army regulations and the Uniform Code of Military Justice having to do with off-installation military enforcement and striking a non-commissioned officer since defendant's arrest was unlawful; his actions in verbally abusing the military policemen and striking one of them were not violative of the Code, as the officers were acting outside their authority in unlawfully detaining defendant; the Code provisions and related Army regulations consequently were irrelevant to the consideration of the facts of the case; and the instructions were prejudicial to defendant, as they strongly suggested that defendant's claim of privilege to resist the efforts of the military policemen to continue his unlawful confinement was totally groundless, regardless of his intent in entering into the affray with them.

Justice LAKE dissents.

DEFENDANT was charged with and convicted of murder in the first degree and assault with a deadly weapon with intent to kill inflicting serious bodily injury. Defendant appeals, pursuant to G.S. 7A-27(a), from judgement of *Godwin, J.*, 20 June 1977 Session, CUMBERLAND County Superior Court, imposing a sentence of life imprisonment on the first degree murder conviction. A sentence of twenty years, to commence at the expiration of the life sentence, was imposed on the assault conviction, which is before us for review upon certification under G.S. 7A-31(a).

The evidence for the State tended to show that:

On the evening of 16 October 1976, Officer Wayne Alsup of the Fayetteville Police Department was on foot patrol walking

the four and five hundred blocks of Hay Street in Fayetteville accompanied by two military policemen, Sergeant Charles Terry and Sergeant Willard Barber. As a result of a conversation that evening between Officer Alsup and Officer Richard Porter of the Fayetteville police, Alsup was on the lookout for a black male wearing a red shirt and a white scarf.

While standing outside Rick's Lounge on Hay Street, Officer Alsup saw a man fitting the description given him by Officer Porter approaching the lounge. Alsup stopped the man, later identified as the defendant, and asked if he was in the military. Defendant replied that he was. The officer then asked to see his identification card and defendant asked why. Alsup responded that he wanted to see who defendant was. After asking several times to see defendant's identification card and being asked why each time in return, Officer Alsup placed defendant against the wall in search position. Defendant tried repeatedly to lift his arms off the wall and had to be held in position by Sergeant Barber and Officer Alsup. The officer then searched defendant for weapons and took defendant's wallet from his pocket. After defendant's military identification card was removed, the wallet was returned to his pocket.

Defendant was then handcuffed and Officer Alsup told Sergeant Terry to take defendant to the Law Enforcement Center. Alsup informed Sergeant Terry that defendant was not being charged with anything, that he was merely being placed in protective custody for the purpose of taking him off the street and returning him to Fort Bragg. A Fayetteville police car was summoned and defendant was taken to the Law Enforcement Center in the company of Sergeant Terry.

Upon reaching the Law Enforcement Center, defendant was taken inside and placed in a holding cell occupied by two other persons. Sergeant Terry then delivered defendant's military identification card to Sergeant Robert Lambert, a military policeman who was on duty that evening to assist the police department in returning apprehended military personnel to Fort Bragg. Sergeant Terry subsequently removed defendant's handcuffs. During this time defendant was talking in a loud voice and was asked repeatedly to be quiet.

State v. Sanders

Sergent Lambert later came to the holding cell area and talked to defendant from outside the cell. Shortly after this conversation commenced, defendant reached through the bars of the cell and slapped Sergeant Lambert in the face. At this point, Sergeant Lambert told defendant that he was in no trouble with the civil authorities, but that he could get in trouble with the military for striking a non-commissioned officer. Defendant replied that he did not care and slapped Sergeant Lambert again.

Sergeant Lambert spoke to Sergeant Terry, who turned to a deputy sheriff on duty at the jail and requested permission to go inside the cell and put handcuffs on defendant. Permission was granted and Sergeant Lambert unlocked the door and entered the cell, accompanied by Sergeant Terry and several other officers. Defendant backed away from the officers as they entered the cell and retreated to the toilet area, which was separated from the rest of the cell by a partition. Upon reaching the toilet area, defendant swung out at Sergeant Lambert. Sergeant Terry then delivered a karate kick to defendant's stomach in an attempt to knock the wind out of him in order to subdue him. Terry then moved toward defendant seeking to pin his arms, at which point defendant reached back and produced a knife and proceeded to stab Terry in the back and left arm. Sergeant Terry shouted that defendant had a knife and fell back to the floor. Defendant then stabbed Sergeant Lambert a number of times. Several officers scuffled with defendant and succeeded in subduing him. Sergeant Lambert subsequently died as a result of the wounds inflicted on him by defendant.

Approximately two weeks before the killing, defendant had been taken into custody by the Fayetteville police and, during a confrontation at the Law Enforcement Center, had been slapped in the face by Sergeant Lambert. At that time, defendant had threatened to kill Lambert if it was the last thing he ever did.

In addition, a saleswoman at a military store in the four hundred block of Hay Street testified that, on the day of the killing about the time defendant was arrested in front of Rick's Lounge, she had sold a ten or twelve inch long survival knife with a black sheath to a man matching the description of defendant on that date, although she never specifically identified the defendant as that man.

Defendant presented evidence which tended to show that he acted in self defense in stabbing the military policeman. According to defendant's testimony, he found the knife on the floor of the cell while he was being assaulted by the officers and, thinking it was a stick, struck at them with it to drive them away from him.

A voir dire hearing was conducted prior to the presentation of the State's case in chief. Based on the evidence adduced at that hearing, Judge Godwin found, among other things, that the initial search and arrest of defendant on Hay Street was unlawful.

Additional facts relevant to the decision are related in the opinion.

*Public Defender Mary Ann Tally for defendant appellant.*

*Attorney General Rufus L. Edmisten, by Special Deputy Attorney General Lester V. Chalmers, Jr., and Assistant Attorney General Joan H. Byers, for the State.*

COPELAND, Justice.

After reviewing defendant's assignments of error, we have concluded that there was prejudicial error in the trial below; thus, defendant must be afforded a new trial. We initially discuss several of defendant's contentions which are without merit but likely to be raised on retrial.

[1] It is argued that the trial court erred in admitting testimony that defendant had been taken into custody approximately two weeks before the killing and had threatened to kill Sergeant Lambert after being slapped by him during an encounter at the Law Enforcement Center following that arrest. Defendant asserts that these events were irrelevant because of the length of time that elapsed between the threat and the killing and that their probative value was far outweighed by the inherent prejudicial effect of informing the jury of this prior arrest.

Evidence of threats by the defendant in a homicide prosecution, however, is freely admissible to show premeditation and deliberation. *State v. Reams*, 277 N.C. 391, 178 S.E. 2d 65 (1970), *cert. denied*, 404 U.S. 840, 30 L.Ed. 2d 74, 92 S.Ct. 133 (1971); 1 Stansbury's N.C. Evidence (Brandis Rev., 1973), § 162a. Moreover,

mere remoteness in time between the utterance of a threat and the commission of a crime ordinarily goes only to its weight and effect as evidence, rather than to its competence. *State v. Shook,* 224 N.C. 728, 32 S.E. 2d 329 (1944) (lapse of nine months between threat and shooting did not render evidence incompetent). The evidence here of the prior arrest was inextricably connected to the circumstances which led to the making of the threat and was competent to show the relations between the parties. *State v. Ray,* 212 N.C. 725, 194 S.E. 482 (1938). This assignment of error is overruled.

[2] Defendant also maintains that his motion for judgment of nonsuit as to all charges should have been granted because the evidence conclusively demonstrated that his actions were fully justified as a valid attempt to escape from an unlawful arrest and that he was privileged to use deadly force because he was confronted by attackers of greatly superior size and number and thus had a reasonable fear of death or serious bodily harm. In passing upon a motion for judgment of nonsuit, the court must consider the evidence in the light most favorable to the State, resolving all contraditions and discrepancies in favor of the State and giving it the benefit of every inference reasonably to be drawn in its favor. *State v. Cutler,* 271 N.C. 379, 156 S.E. 2d 679 (1967).

A person indeed has the right to resist an unlawful arrest by the use of force, as in self defense, to the extent that it reasonably appears necessary to prevent unlawful restraint of his liberty. *State v. Mobley,* 240 N.C. 476, 83 S.E. 2d 100 (1954). Nonetheless, a killing done with malice and not in self defense is murder, even though the person killed may have been seeking to effect an unlawful arrest upon the defendant. *Mims v. Commonwealth,* 236 Ky. 186, 32 S.W. 2d 986 (1930); 40 C.J.S. Homicide § 19, p. 866 (1944); 40 Am. Jur. 2d Homicide § 104, p. 399 (1968). Further, although a party is privileged to use deadly force to defend against an attack by unarmed assailants of vastly superior size, strength or number, *State v. Pearson,* 288 N.C. 34, 215 S.E. 2d 598 (1975), if the defendant precipitated the altercation intending to provoke a deadly assault by the victim in order that he might kill him, his subsequent killing of the victim in response to the attack is murder. *State v. Martin,* 24 N.C. (2 Ire.) 101 (1841) (per Ruffin, C.J.).

The State's evidence tended to show that: (1) about two weeks before the killing defendant, in response to being slapped by the deceased, had threatened to kill him if it was the last thing he ever did; (2) while the deceased was standing near the holding cell talking to defendant just prior to the stabbing, defendant reached through the bars and slapped the deceased; (3) the deceased warned defendant that, while he was in no trouble with the civil authorities, he could get in trouble with the military for striking a non-commissioned officer; (4) defendant replied that he did not care and slapped the deceased again; (5) as the deceased and Sergeant Terry opened the cell door, defendant stood back and told them to come on in, that he would fight all of them, that he would kill all of them and to bring their buddies; (6) as the two military policemen entered the cell, defendant kept telling them to come on, that he would "kick [their] asses and to bring all the deputies and he would kick their asses"; (7) defendant then began backing toward the toilet area of the cell, telling the military policemen to come on, that he had something for them; (8) the military policemen, who were much larger physically than defendant, were accompanied into the cell by several deputy sheriffs; (9) defendant backed into the toilet area of the cell, which was separated from the rest of the cell by a partition such that the entrance would permit only one person to walk through; (10) Sergeant Terry stepped around the deceased, who had stopped at the partition, and moved into the toilet area, where he delivered a karate kick to defendant's stomach in an attempt to knock the wind out of him so that he could be subdued and handcuffed; (11) after the kick, defendant bent over, then straightened up, smiled, and waved for Sergeant Terry and the deceased to come on; (12) Sergeant Terry moved forward and grasped defendant's arms, seeking to pin him against the wall, at which time defendant reached back, produced a knife and stabbed Sergeant Terry in the back and left arm; (13) defendant then stabbed the deceased several times; (14) at about the time defendant was initially arrested on Hay Street on the date of the killing, a man matching defendant's description had bought a survival knife with a black sheath at a military store near the site of the arrest; (15) shortly after purchasing the knife, this man was seen by the military store saleswoman being placed against the wall outside Rick's Lounge by a city policeman and two military policemen; (16) the knife used by defendant in the stabbing of the two victims was

described as a large hunting knife; (17) after the altercation, a dark knife sheath was observed in the waist of defendant's pants just above the left rear pocket; (18) defendant, in a statement taken after the slaying, indicated that when he carried a knife he usually placed it in front of his stomach or in back, since an officer would find it in a pat-down search if it was placed on the side.

The trial court, after a voir dire hearing, concluded that the initial arrest of defendant on Hay Street was unlawful. For reasons which are outlined later in this opinion, we have determined that any subsequent attempt to arrest defendant for striking a non-commissioned officer was likewise illegal. Nevertheless, defendant's prior threats against the deceased's life and his statements to the military policemen to come on, that he had something for them, together with his actions in deliberately backing into the toilet area of the cell and waving the victims toward him before drawing the knife, were sufficient to allow a jury to reasonably infer that defendant, after seeing the deceased at the Law Enforcement Center following his unlawful apprehension, decided to make good his earlier threat and further, that defendant, by coincidence already having a knife in his possession, designedly and maliciously goaded the deceased into entering the cell and following him into the confined area of the toilet, where defendant stabbed the deceased and Sergeant Terry. Under these circumstances, the trial court was correct in denying defendant's motion for nonsuit; therefore, this assignment of error is overruled.

[3] We next consider defendant's exceptions to the trial court's refusal to permit three defense witnesses to testify as to why they thought the military policemen and deputies entered the holding cell prior to the stabbing. The witnesses, if allowed to answer, would have stated that, in their opinion, the officers went into the cell for the purpose of beating up defendant.

Opinion evidence ordinarily may not be admitted when the facts underlying the opinion are such that the witness can state them in a manner which will permit an adequate understanding of them by the jury and the witness is no better qualified than the jury to draw inferences and conclusions from the facts. *State v. Watson*, 294 N.C. 159, 240 S.E. 2d 440 (1978). Moreover, a

witness's opinion of another person's intention on a particular occasion is generally held to be inadmissible. *State v. Patterson*, 288 N.C. 533, 220 S.E. 2d 600 (1975), *death sentence vacated*, 428 U.S. 904, 49 L.Ed. 2d 1211, 96 S.Ct. 3211 (1976); *Ballard v. Ballard*, 230 N.C. 629, 55 S.E. 2d 316 (1949); *State v. Vines*, 93 N.C. 493 (1885).

It was certainly possible for the witnesses to inform the jury of the words, acts and demeanor of the officers as they entered the cell. In addition, it does not appear that these witnesses were in any way more qualified than the jury to conclude what the officers intended to do at that time; therefore, the exclusion of this evidence was proper and this assignment of error is overruled.

[4]  After a voir dire hearing, the trial court, on competent evidence, found that defendant, following his arrest for the murder of Sergeant Lambert, was given the full warnings required by *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966), and, without threats or inducements of any sort, signed a written waiver of his right to remain silent and his right to the presence of an attorney during questioning. Defendant subsequently made an inculpatory statement to officers of the Sheriff's Department which was reduced to writing, signed by him and ultimately admitted into evidence at trial over objection. It is now argued by defendant that this statement was the fruit of the original unlawful arrest on Hay Street and therefore should have been suppressed.

Defendant relies largely upon the recent case of *Brown v. Illinois*, 422 U.S. 590, 45 L.Ed. 2d 416, 95 S.Ct. 2254 (1975), in which the Supreme Court of the United States held that the mere fact that police had warned a suspect who had been subjected to an unlawful arrest of his rights under *Miranda v. Arizona, supra,* could not, without more, serve to establish that an inculpatory statement made by him following the warnings was sufficiently an act of free will under *Wong Sun v. United States*, 371 U.S. 471, 9 L.Ed. 2d 441, 83 S.Ct. 407 (1963), to sever the causal connection between the illegal arrest and the statement. The Court thus rejected any rule which would permit a finding of voluntariness under the Fifth Amendment standards of *Miranda* to satisfy per se the Fourth Amendment requirement, set forth in *Wong Sun*, that any connection between an illegal arrest and a subsequent inculpatory statement be so attenuated as to dissipate the taint of

the unlawful arrest. The Court also expressly declined to adopt the so-called "but-for" test which would require the suppression of any statement made subsequent to an illegal arrest, regardless of the circumstances.

Instead, the Court determined that,

"The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution." *Brown v. Illinois, supra* at 603-604, 45 L.Ed. 2d at 427, 95 S.Ct. at 2261-2262, (citations omitted).

The trial court here made findings and conclusions which satisfied the threshold requirement of voluntariness of the statement, but did not attempt an analysis of the other factors outlined in *Brown.* Although it is the better practice to find all facts upon which the admissibility of a statement depends, its admission without sufficient findings is not error if there is no material conflict in the evidence on voir dire. *State v. Riddick*, 291 N.C. 399, 230 S.E. 2d 506 (1976). When the uncontradicted evidence clearly tends to establish that the statement was not subject to suppression, the necessary findings are implied from the admission of the statement into evidence. *State v. Whitley*, 288 N.C. 106, 215 S.E. 2d 568 (1975). In the instant case, defendant presented no evidence on voir dire; thus, there was no conflict in the evidence and the admission of the statement was not error if there was sufficient proof that it was not obtained by undue exploitation of the unlawful arrest.

In *Brown v. Illinois, supra,* no significant intervening event occurred between the defendant's unlawful arrest and his statement; moreover, the arrest there was executed for the purpose of turning up evidence and was obviously investigatory. In the case *sub judice,* however, the evidence tended to show that, while defendant's statement was signed less than three hours after his initial illegal arrest, during this time defendant killed one military policeman, seriously wounded another and, with probable cause, was placed under lawful arrest for murder. It also appears from the record that defendant's original arrest, while flagrantly unlawful, was carried out for the purpose of taking him off the street and transporting him back to Fort Bragg in order to prevent him from causing trouble in the Hay Street area.

Defendant's unlawful arrest consequently lacked the intentionally investigatory quality which was found so offensive to the Fourth Amendment guarantees in *Brown.* In addition, the lawful homicide arrest was interposed between the earlier unlawful arrest and defendant's subsequent inculpatory statement. *Cf., Johnson v. Louisiana,* 406 U.S. 356, 32 L.Ed. 2d 152, 92 S.Ct. 1620 (1972) (lineup following commitment by a magistrate after an unlawful arrest was carried out during detention imposed under authority of the commitment, and thus was not conducted by exploitation of the challenged arrest). From these factors we conclude that defendant's statement was sufficiently attenuated from the unlawful arrest such that it was not obtained by undue exploitation of the Fourth Amendment violation and was properly admissible in evidence. This assignment of error is overruled.

Defendant further maintains that even if his signed statement was not subject to suppression as fruit of the unlawful arrest, certain portions of it should have been excluded under various common law evidentiary rules. The segments of the statement to which defendant excepts are those in which he explained that when he carried a knife he placed it in front of his stomach or in back because an officer patting him down would be more likely to find it if it was carried to the side, and that he had been in a gang when he lived in Philadelphia, during which time he had carried a knife and had stabbed one of the other gang members, and that when he went to court on the charge he had told the judge that he hoped the other gang member died.

[5] It is argued that the first of these segments is objectionable because it was a mere opinion and not based on any special expertise in these matters. This admission, however, is primarily one of fact as to where defendant carried a knife. Moreover, the prevailing rule now is that admissions in the form of opinions are competent. *Wells v. Burton Lines, Inc.*, 228 N.C. 422, 45 S.E. 2d 569 (1947); McCormick, Handbook on the Law of Evidence § 264 (2d ed. E. Cleary 1972); *but cf.*, 2 Stansbury's N.C. Evidence (Brandis Rev., 1973) § 167. This portion of the statement was therefore admissible.

[6] Defendant asserts that the evidence of his gang membership in Philadelphia was inadmissible since it was presented during the State's case in chief and thus violated the rule prohibiting the use of character evidence against an accused who has not testified or put his character in issue. He contends that the evidence of the prior stabbing and the alleged death wish should have been excluded under the general ban on proof of other offenses on the issue of guilt of a defendant.

Where a defendant has neither testified as a witness nor introduced evidence of his good character, the State may not present evidence of his bad character for any purpose. *State v. Tessnear*, 265 N.C. 319, 144 S.E. 2d 43 (1965). Defendant did not place his character in issue at trial and at the time the State's evidence of defendant's earlier gang membership was offered, he had not testified; therefore, it was not properly admissible at the time it was presented.

"It is well settled that in the trial of one accused of a criminal offense, who has not testified as a witness in his own behalf, the State may not, over objection by the defendant, introduce evidence to show that the accused has committed another independent, separate criminal offense where such evidence has no other relevance to the case on trial than its tendency to show the character of the accused and his disposition to commit criminal offenses." *State v. Perry*, 275 N.C. 565, 570, 169 S.E. 2d 839, 843 (1969).

The State here contends that the evidence of the prior stabbing was admissible to show defendant's familiarity with knives in order to rebut his testimony that he found the knife on the cell floor and, thinking it was a stick, began swinging it at the officers

in an attempt to clear some room to run. *State v. Smoak*, 213 N.C. 79, 195 S.E. 72 (1938), is cited in support of this position. That case involved the alleged murder of a young girl by her father which was carried out by means of strychnine poisoning. Following the girl's death, the father collected the proceeds of an insurance policy on her life. At trial, evidence was admitted which tended to show that the defendant had killed his first two wives by the use of strychnine and collected life insurance proceeds shortly after their deaths. There was also evidence that the defendant had poisoned the mother of a woman with whom he had been living and he had insurance on that victim's life at the time. This later victim had survived. This Court held that evidence of the other similar poisonings was admissible to establish criminal intent on the part of the defendant and quoted from a California case that admitted such evidence to show familiarity with the effects of strychnine.

In the case under consideration, however, the evidence of the prior stabbing showed a single, isolated event with insufficient elaboration of the surrounding circumstances to afford it any probative value on the question of defendant's intent during the incident which gave rise to these charges. *Cf., State v. May*, 292 N.C. 644, 235 S.E. 2d 178, *cert. denied*, 98 S.Ct. 414 (1977) (evidence of a similar earlier robbery committed with the same sawed-off shotgun was admissible to show intent in a subsequent murder carried out in the course of an attempted robbery). In addition, the use of a knife, as compared with poison, is not so uncommon or particularized a skill as to support an exception to the general rule of exclusion of evidence of prior crimes. Finally, the State's argument ignores the fact that the evidence of this prior stabbing was presented during the State's case in chief and not on rebuttal.

After careful consideration, we fail to see that the evidence concerning this earlier stabbing had any logical relevance to the facts at hand other than to show a tendency on the part of defendant to commit criminal offenses; therefore, it was inadmissible. *State v. Perry, supra.* If a defendant's in-custody statement contains irrelevant and prejudicial matter which can be separated from the relevant portions, the State may introduce only the relevant matter. *State v. Fowler*, 230 N.C. 470, 53 S.E. 2d 853 (1949). The inadmissible portions of defendant's statement

were readily severable from the remainder; consequently, the trial court's failure to do so was error.

**[7,8]**  We now consider defendant's contention that the trial court erred in reading to the jury during its charge certain provisions of United States Army regulations and the Uniform Code of Military Justice having to do with off-installation military enforcement and striking a non-commissioned officer. As noted earlier, the trial court, after a voir dire hearing, determined that defendant's initial arrest on Hay Street was unlawful. The circumstances leading to that arrest were: (1) Officer Alsup of the Fayetteville Police Department, while on foot patrol with two military policemen, was informed by Police Officer Porter that there had been some trouble at Rick's Lounge and that a black male subject inside giving a "little bit of disturbance" had been told to leave the bar and asked to leave the block; (2) Officer Porter asked Officer Alsup to be on the lookout for the subject; (3) Officer Alsup and the military policemen subsequently encountered defendant, who matched the description given by Officer Porter, as defendant was walking past the front of Rick's Lounge; (4) Officer Alsup stopped defendant, asked if he was in the military and, upon being told that he was, requested to see defendant's identification; to which defendant responded "Why?"; (5) this exchange was repeated several times, at which point defendant was placed against a wall, searched, and his military identification card taken from him; (6) defendant was then handcuffed and informed that he was not being arrested, but was merely being taken off the street for transportation back to Fort Bragg; (7) defendant was subsequently placed in an unmarked police car and taken to the Law Enforcement Center.

Under G.S. 15A-401(c)(1),

"An arrest is complete when:

a. The person submits to the control of the arresting officer who had indicated his intention to arrest, or

b. The arresting officer, with intent to make an arrest, takes a person into custody by the use of physical force."

Defendant here resisted his apprehension on Hay Street, both physically and verbally; thus, this case is governed by subpart b. of subsection (c)(1). Although the police officer informed

defendant that he was not under arrest, he nonetheless was handcuffed, placed in the police car and taken to the Law Enforcement Center against his will.

Just as a formal declaration of arrest is not essential to the making of an arrest, an officer's statement that a defendant was or was not under arrest is not conclusive. *State v. Tippett*, 270 N.C. 588, 155 S.E. 2d 269 (1967). When a law enforcement officer, by word or actions, indicates that an individual must remain in the officer's presence or come to the police station against his will, the person is for all practical purposes under arrest if there is a substantial imposition of the officer's will over the person's liberty. *Huebner v. State*, 33 Wis. 2d 505, 147 N.W. 2d 646 (1967).

There was no showing of probable cause for arrest of defendant without a warrant. Defendant's conduct in the officer's presence on Hay Street in no way appears to have been criminal and the allegation that defendant created a "little bit of disturbance" earlier in Rick's Lounge does not demonstrate sufficiently provocative behavior to rise to the level of disorderly conduct under G.S. 14-288.4(2). The trial court therefore was correct in determining that, nothwithstanding the officer's declaration to the contrary, defendant's initital detention here was in fact an arrest and that it was unlawful since it was not based on probable cause.

The provision of the Uniform Code of Military Justice which was read to the jury during the charge is found at 10 U.S.C. § 891 and makes it a court-martial offense for an enlisted man to strike, assault or treat with disrespect a non-commissioned officer while that officer is in the execution of his office or to disobey a lawful order of a non-commissioned officer. Army Regulation 190-24, chapter 3, section 3-3 was also read to the jury during the court's instructions and authorizes Armed Forces enforcement personnel to apprehend any person subject to the Uniform Code of Military Justice when a reasonable belief exists that such a person has committed an offense under the Code.

These provisions were submitted for consideration by the jury in support of the State's contention that, while defendant's original arrest was unlawful, he was still a soldier and subject to the Uniform Code of Military Justice and during his confinement at the Law Enforcement Center he struck and was otherwise disrespectful in language and deportment toward a non-

commissioned officer. From this it was asserted that the jury should find that defendant had violated the Code and, as a result, Sergeants Terry and Lambert were acting within the scope of their offices in entering the cell prior to the fatal altercation and that, consequently, this subsequent arrest attempt was not unlawful and defendant had no right or privilege to resist their efforts to handcuff him.

The provision of the Code relied on by the State, however, requires that the alleged disrespect or assault occur while the non-commissioned officer *"is in the execution of his office."* 10 U.S.C. § 891 (emphasis added). Military law enforcment personnel who unlawfully apprehend a subject or perpetrate his unlawful custody are acting in excess of the scope of their offices, both as military law enforcement personnel and as non-commissioned officers. *United States v. Rozier,* 1 M.J. 469 (Court of Military Appeals, 1976); cf., *State v. Sparrow,* 276 N.C. 499, 173 S.E. 2d 897 (1970), *cert. denied in,* 403 U.S. 940, 29 L.Ed. 2d 719, 91 S.Ct. 2258 (1971) (one who resists an unlawful entry by a police officer is not resisting an officer in the discharge of the duties of his office).

The initial arrest and the ensuing custody here were clearly unlawful. After defendant's arrest on Hay Street, he was taken to the Law Enforcement Center in the company of Sergeant Terry and placed in the holding cell. Sergeant Terry then went to Sergeant Lambert's office, where he gave Lambert defendant's identification card and "described to him what had happened." Sergeant Lambert thus was aware of the circumstances of defendant's arrest, but refused to release him upon his demand; therefore, defendant's actions in verbally abusing the military policemen and striking Sergeant Lambert were not violative of the Code since the officers were acting outside their authority in unlawfully detaining defendant. The Code provisions and the related Army regulations consequently were irrelevant to the consideration of the facts of this case.

Although objections to the trial court's statement of the contentions in its charge ordinarily must be brought to the trial judge's attention in sufficient time to permit correction, when these statements contain an erroneous view of the law or an incorrect application of it, counsel need not bring the error to the

court's attention in order to have the matter considered on appeal. *State v. Winford*, 279 N.C. 58, 181 S.E. 2d 423 (1971). Moreover, an instruction on an abstract proposition of law which is not pertinent to the facts of the case at hand is error. *State v. Duncan*, 264 N.C. 123, 141 S.E. 2d 23 (1965).

The prejudicial nature of the instruction here can hardly be doubted, since it strongly suggested to the jury that defendant's claim of privilege to resist the efforts of the military policemen to continue his unlawful confinement was totally groundless, regardless of his intent in entering into the affray with them. We therefore conclude that the trial court committed reversible error in submitting the instructions on the Uniform Code of Military Justice and Army Regulations to the jury.

We deem it unnecessary to discuss defendant's remaining assignments of error, inasmuch as the matters which gave rise to them probably will not recur on retrial.

For the reasons set out above, we have determined that prejudicial error occurred in the trial below; consequently, defendant's conviction is set aside and the case remanded for

New trial.

Justice LAKE dissents.